## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **TAYBRONNE A. WHITE,** | ) | |
| | ) | |
| Petitioner, | ) | Case No. 7:20CV00199 |
| | ) | |
| **v.** | ) | **OPINION** |
| | ) | |
| **WARDEN KISER,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Respondent. | ) | |

*Taybronne A. White, Pro Se Plaintiff; Eugene Murphy, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Respondent.*

Taybronne A. White, a Virginia inmate proceeding pro se, brings this petition for habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 2014 Greene County convictions for attempted robbery, armed statutory burglary, possession of a firearm by a convicted felon, first degree murder, two counts of second degree murder, and four counts of use of a firearm in the commission of a felony. For these offenses, White was sentenced to seventy-six years in prison. The respondent has filed a Motion to Dismiss, to which White has responded. Upon review of the extensive record, transcripts, and pleadings, I find that White has procedurally defaulted seven of his claims. On the remaining twenty-two claims, most of which allege ineffective assistance of trial counsel, I find that White has failed to show that the state court's

decision was contrary to or an unreasonable application of clearly established federal law, and nor has he shown that the decision was based on an unreasonable determination of the facts.  Accordingly, I grant the respondent's motion.

# I. BACKGROUND.

## A. The Crime.

Shortly after 2:00 a.m. on May 3, 2011, two armed, masked men broke into the home of Willie Roy and Jermaine and Martha Frye by kicking out a panel of the front door.  One intruder carried a rifle and the other carried a pistol.  They told Roy to "give it up," but he asked what they were talking about.  They told Roy to "get Jermaine."  One intruder struck Roy in the face with a pistol, knocking loose three of his teeth.  The assailants then escorted Roy to Frye's room.  Frye said that there might be something in the truck, and the two intruders left.  Fearing they would return, Roy fled the house, and Frye called 911.  Approximately fifteen minutes later, the bodies of Dustin Knighton, Brian Daniels, and Lisa Hwang were found on a nearby road less than five minutes from the scene of the attempted robbery.  Knighton was wearing blue latex gloves and a white face mask; a rifle was near his body.  Police also found a 9-mm pistol and detached clip near Hwang's body.

## B. Before the Trial.

Deputies from the Greene County Sheriff's Office investigated the home invasion at the Roy/Frye household.  They also investigated the nearby homicides

along with Virginia State Police.  Albemarle County police officers were involved in collecting some evidence, particularly from a vehicle belonging to Lisa Hwang that was found parked in the middle of the road in Albemarle County.  News media identified White as a person of interest that police were looking for, and White voluntarily turned himself in to the Greene County Sheriff's Office on May 9, 2011, where he was promptly arrested.

### C. Preliminary Hearing.

On September 28, 2011, the General District Court for Greene County presided over White's preliminary hearing.  The Commonwealth presented testimony from eight law enforcement officers, a 911 dispatch records custodian, two forensic scientists, Willie Roy, Greg Snow (who first found the bodies), and Junior Snow (who called 911), and others.  The court found probable cause that crimes had occurred, and that White had committed those crimes, and certified the case to the grand jury.

As relevant to the § 2254 petition in this court, only a portion of the preliminary hearing testimony of Willie Roy requires elaboration.  In addition to describing the break-in that woke him up, Roy described the intruders.  On direct examination, he described the masked person who hit him with the pistol as a black male with a bandana covering his face.  Roy saw the side of the intruder's neck and "maybe a little bit of the jaw line, maybe."  Prelim. Hr'g Tr. at 52.  Roy described

this person as a little taller than himself, but he could not estimate the man's height. The second masked intruder sounded "white" when he talked, but Roy never saw any part of his face; that person carried a long gun which "looked like an assault rifle" to Roy. *Id.* at 61.

On cross-examination, Roy acknowledged drinking as much as a six-pack of beer after work. Roy also was taking a strong prescription for pneumonia, but he could not remember the name of it; the bottle contained a warning about drowsiness. The following excerpt describes the cross-examination of Roy's description of the assailants:

> Q. Okay. You described the black male as wearing a bandana?
>
> A. Yeah.
>
> Q. Could you see whether there was any pattern printed on the bandana?
>
> A. It looked like it was white, a bandana.
>
> Q. A white pattern on top of a black bandana?
>
> A. Just a bandana.
>
> Q. Okay. It was—
>
> A. It had white in the bandana. That's what I believe, yeah.
>
> Q. Okay, and the background color was what?
>
> A. I believe—I just—I can't remember it offhand.

4

Q.  Okay.  Did you—okay, so it was a white pattern on some other colors?

A.  Yeah.

Q.  Your recollection of it?

A.  It was a bandana.  That's all I can remember.

Q.  Okay, but was there more than one color to it, could you tell?

A.  Oh yeah, probably two colors—

Q.  Okay.

A.  –but what color, I can't remember right off the top of my head.

Q.  Okay, and the man that you said you thought was probably white, can you describe the bandana that he had on?

A.  He had a white thing around his head.

Q.  Okay, and did you notice anything else significant about him?

A.  No.

*Id.* at 67–68.  Later, counsel asked Roy if the Black male had a hat on his head, and Roy answered, "I can't remember.  At that time I think it was a hat, but I can't say what the hat looked like or whatever but he was covered."  *Id.* at 75.

### D.  Indictments.

On October 11, 2011, a grand jury sitting in the Greene County Circuit Court indicted White for the first degree murder of Brian Daniels, attempted robbery of Willie Roy, armed statutory burglary, aggravated malicious wounding of Willie Roy, possession of a firearm by a convicted felon, first degree murder of Dustin Knighton, first degree murder of Lisa Hwang, use of a firearm in the commission of attempted robbery, three charges of use of a firearm in commission of a murder, and two of capital murder.

### E.  Pretrial Proceedings.

The Circuit Court appointed the Capital Defender's Office and another capital-qualified attorney to represent White.  The attorneys mounted a vigorous investigation in preparation for trial, filing 67 motions.  They secured court appointment of and funds for an investigator, a DNA expert, an expert on intellectual disability, a crime scene expert, a forensic pathologist, an expert in digital and video photography, a footwear expert, a fingerprint expert, a ballistics and firearms expert, and a forensic psychologist for mitigation evidence.  They filed motions for subpoenas to secure phone records of the deceased, plus ex parte motions for

voluminous background, educational, medical, and social services information to prepare for sentencing. They filed motions for specific *Brady* evidence. [1]

Because of their diligence, counsel provided sufficient documentation that White is intellectually disabled (formerly known as mentally retarded), and as such, he was not eligible for the death penalty. By securing and providing this information early, defense counsel persuaded the Commonwealth to withdraw the death penalty. The Commonwealth nolle prossed the capital murder indictments on February 1, 2013. Ct. Proc. Tr. vol. I, 164–168.[2]

Defense counsel filed a motion to suppress Roy's identification of White in a photo lineup, arguing that suggestive procedures were used. Prior to the hearing on the motion, defense counsel and the Commonwealth reached an agreement, under which the Commonwealth would not introduce any evidence about Roy picking White out of a photo lineup, nor would Roy identify White in court as the person who assaulted him with a pistol in his home. However, Roy would be allowed to

---

[1] Material evidence potentially favorable to the defense, whether for guilt/innocence determination, for impeachment, or for sentencing, that a prosecutor is required to disclose promptly to the defense under *Brady v. Maryland*, 373 U.S. 83 (1963).

[2] Except for separately transcribed witness testimony at the evidentiary hearings held on motions on September 10 and September 13, 2013, the court proceedings in the trial court, from initial appointment of counsel, through all pretrial motions, jury selection, jury trial, sentencing by the court, and motion to set aside judgment, were transcribed in fourteen consecutively paginated volumes. All citations to those volumes will be abbreviated as "Ct. Proc. Tr."

describe the assailant and to identify any features of White that looked similar to the assailant's features (i.e., clean shaven and angle of jawline).  *Id.* at vol. II, 252–254.

Counsel also filed a motion to suppress the testimony of "Y," a witness who came forward a year and a half after the crime and alleged she had seen White walking through the path leading from where Hwang's car had been found to the apartment complex where White lived.  She had seen White's picture on television about a week after, indicating that he was wanted by police.  She did not tell anyone about having seen him, not even her husband, until she found herself facing jail time in another jurisdiction and hoped her cooperation in this case could get her work release.  She contacted the Commonwealth's Attorney, who sent her to the Sheriff's Office to be interviewed.  The police conducted a photo lineup in which she was shown six pictures, one at a time, and asked if the person she saw that night was in there.  One of the pictures was the same photo shown on television when police were looking for White, and she picked him out.  The court denied the motion to suppress, finding that the identification procedure was not suggestive, even though the officers admittedly failed to comply with all department procedures during the photo lineup.  The circumstances surrounding her identification, including the officer failing to follow departmental guidelines, would go to the weight of her testimony, not to admissibility.  *Id.* at vol. III, 848–853.

Before trial, counsel filed one motion to dismiss all charges and another to dismiss charges or preclude Willie Roy from testifying. The first motion to dismiss argued that White's due process rights had been violated because the evidence was compromised by police misconduct, resulting in the unavailability of potentially exculpatory evidence. Evidence technician for the Greene County Sheriff's Office, James Shifflett, pled guilty to embezzlement of approximately $19,000 from the evidence storage area; among the money taken was over $800 recovered from the victim's car in White's case. To further complicate the situation, the department's evidence tracking software was not working, so there was no way to ascertain from computer records whether other evidence had been taken. Even though the evidence in White's case was stored in a private unit devoted solely to that case, evidence from other cases had been found in the unit. Shifflett confessed to stealing money but denied tampering with or taking any other evidence from White's case or anyone else's. The court ruled that the potentially exculpatory nature of the money was not apparent at the time it was taken, and thus no due process violation had occurred. *Id.* at vol. III, 853–857.

The other motion to dismiss was based upon lack of synchronicity between the audio and the video recording of Roy's statement to police. The audio recording was six and a half minutes shorter than the video. The Commonwealth asserted that the problem had been apparently caused by a difference in recording speed between

the audio and the video; the Sheriff's Department had purchased new recording systems since the time of Roy's statement to police, because they had discovered ongoing problems with the older system. Defense counsel suggested that the different length of time between the video and the audio created an appearance of unreliability. Because the accuracy of the transcription of that interview was important to White's right to cross examine his accuser, counsel argued that his due process rights were violated by the prosecution's failure to provide a recording that appeared reliable. The court denied this motion, noting that counsel offered no evidence that either the video or the audio tape had been tampered with, even though counsel had obtained a digital evidence expert to examine the recording. The transcript of the audio was available for impeaching Roy on other matters, and the remedies suggested by counsel were deemed too extreme for what appeared to be simply a technology problem. *Id.* at vol. II, 272–298.

Two weeks before trial, both sides argued several motions in limine. Among those motions, the defense sought to exclude testimony from the Commonwealth's footwear expert on the ground that such testimony was not supported by the scientific community, and to exclude the touch DNA evidence on the 9-mm pistol, because no statistical probability analysis was available on that report. The Commonwealth moved to preclude the defense from asking evidence technician Shifflettt about lying on his employment application, because it was a collateral

matter.  The Commonwealth also moved to have the jury view the victim's Honda in which two of the shootings had taken place.  Ultimately, the Commonwealth limited the footwear expert's testimony to shoe size and not to offer opinion on wear patterns inside the shoe.  The DNA evidence was admitted.  The defense did not question Shifflett about the lie on his employment application, and the jury did not view the victim's Honda.  *Id.* at vol. II, 309–394.

### F.  The Jury Trial.

On September 24, 2013, the parties selected twelve jurors and two alternates. The defense renewed a motion to transfer venue, because of pretrial publicity, and because only one African American was on the venire panel of seventy-nine prospective jurors.  The motion to transfer venue was denied.  Opening arguments and examination of witnesses began the following morning.  Over the next nine days, the Commonwealth presented forty-three witnesses and 146 exhibits in its case. Only that evidence necessary to support the conviction and respond to White's petition is set forth below.  The evidence is presented in the light most favorable to the Commonwealth.

On May 3, 2011, around 2:15 a.m., two males broke into the residence of Jermaine Frye and Willie Roy on Ford Avenue.  Frye and Roy both testified that the intruders were masked.  One intruder was African American, wearing a black bandana on his face, and the other was either white or light skinned, with his face

and head covered in white.  The African American intruder demanded to see "Jermaine" and then struck Roy in the face with a pistol, damaging his teeth and driving one tooth through his lips; the other intruder carried a rifle.  Both burglars left the home after both Roy and Frye insisted that they had no money in the house. *Id.* at vol. IV, 950–1022.

On Octonia Road, which intersected Ford Avenue, Greg Snow was driving home from his brother's house.  Snow turned left onto South River Road, and then a car passed him at a high rate of speed before turning onto Bull Yearling Road. Snow realized that he had left his wallet at his brother's house, so he turned around and headed back to Octonia Road.  In the 1900 block, around 2:30 a.m., he came across three bodies in the road, which had not been there a few moments earlier.  He did not have a cell phone, but he quickly drove back to his brother's house.  The two drove back to Octonia Road, and then Junior Snow called the police from his cell phone.  *Id.* at vol. IV, 1049–1088.

The bodies were identified as Dustin Knighton, Brian Daniels, and Lisa Hwang.  Knighton had three gunshot wounds, the fatal wound being to the back of his head.  A white shirt covered his face, and he was wearing blue latex gloves. Daniels had four wounds, the fatal one entering his torso and traveling through his kidney and other vital organs.  He had a pair of blue latex gloves in his pocket.

Hwang, whose body was fifty- to one-hundred yards away from the other two, had been shot four times in the head.

In addition to the bodies, the police found a .22 caliber rifle near Knighton's body and a 9-mm Luger pistol several yards from Hwang's body.  They also found a cigarette butt near the pistol.  In the daylight, a bloody black tee shirt was found on the side of the road on nearby Route 33.

Meanwhile in Albemarle County, Malika Ouenza, who lived off a cul-de-sac intersecting Old Brook Road, drove her sister to work around 3:40 a.m.  When she returned less than ten minutes later, she noticed a car on Old Brook Road that was not parked correctly and appeared to be in the ditch.  The passenger front door was wide open.  After returning home, she called police.  *Id.* at vol. V, 1321–1329. Around 6:30 a.m., Albemarle County Police Officer Kavanah arrived in the 1500 block of Old Brook Road and observed a 2012 Honda Civic, later determined to belong to Lisa Hwang.  The front passenger door was slightly open, and blood was visible on the outside and inside of the car.  Albemarle County Officer Carol Townsend processed the car for evidence, taking swabs from the back support of the driver's seat, saturated with blood, and from blood stains on the left rear seat headliner and on the center console.  Inside the car, fifteen spent cartridge casings were collected, along with a blue bandana.  All the items were submitted to the lab for analysis, along with a pair of black athletic shoes seen that morning in the right

turn lane of U.S. 29 in Albemarle County by a passing citizen, Larry Patterson, who called the police. The shoes had blood on the soles. *Id.* at vol. V, 1301–1306, 1403–1431; vol. VI, 1445–1594.

Forensic scientist Wendy Gibson, a firearm and tool marks analyst from the Virginia Forensic Science Department, testified that six of the spent casings in the Honda had been fired from the .22 caliber rifle found near Knighton's body. The other nine casings had been fired from the 9-mm pistol found near Hwang. Bullet fragments from Hwang's head had been fired from the .22 caliber rifle. The bullet fragments from Daniels' body had similarities to the bullets test-fired from the 9-mm pistol, but the bullet fragment was too badly damaged for a definitive identification. *Id.* at vol. VIII, 2127–2163.

Angie Rainey, a forensic biologist with the Forensic Science Department, analyzed the various blood samples and other evidence for DNA. The stain on the rear seat headliner matched Knighton's DNA. The blood from the driver's seat matched Daniels' DNA. The blood stain on the center console and on the outside of the car matched Hwang's DNA. The bloody tee shirt found on Route 33 had a DNA mixture in the blood; neither Daniels nor White could be eliminated as contributors of that blood sample, based on DNA, but all other persons of interest were eliminated. The blue bandana from the Honda had a blood stain with a DNA mixture; the primary contributor to that DNA was consistent with White's DNA

14

profile, and the probability of the blood profile matching someone other than White was 1 in 6.5 billion.   The minor contributor to the DNA on the bandana was consistent with Hwang's DNA.   Swabs from the steering wheel of Hwang's car contained a mixture of touch DNA, from which White could not be eliminated as a contributor, as did the 9-mm pistol and the cigarette butt on Octonia Road.   The black athletic shoes found on U.S. 29 had several blood stains on the soles, with DNA matching Roy, Daniels, Knighton, and Hwang.   *Id.* at vol. VIII, 1920–2106; Ex. 130–134.   Further, the sole of the right athletic shoe was similar to an imprint found on the door panel kicked out during the invasion of Frye and Roy's home. The shoes were also similar in size to a pair of shoes known to belong to White.   *Id.* at vol. IX, 2291–2310.

Aubrey Tomlin, a friend of Knighton and Daniels who had known White for six or seven years, testified that White called him on May 1 to ask for Knighton's phone number.   *Id.* at vol. IX, 2294–2298.   Jessica Houchens, a childhood friend of Knighton and Daniels, testified that Knighton called her on May 2, 2011, around 10:30 or 11:00 in the morning, asking her to pick him up.   She picked him up, and Daniels was with him.   After stopping at the liquor store, they went to her cousin Misty's house, where Houchens' three-year-old son was playing with Misty's son. Then Misty and the children followed in her car as Houchens and the men drove back to Houchens' home.   Essentially, the adults drank and played with the children.

Knighton's older brother Derrick came by and talked privately with Knighton. Houchens and Misty and the children left to pick up Misty's other three children from school. When they returned, Derrick had left, and Knighton and Daniels were still drinking.  Misty's boyfriend dropped by and took Misty and her daughters to softball practice, while Houchens watched the boys.  Around 7:30 or 8:00 p.m., Knighton and Daniels borrowed her car.  They were gone longer than she expected, and Houchens fell asleep on the couch.  They finally returned around 9:30 or 10:00 p.m., and they had somebody with them, whom Knighton introduced as Sleepy (White's nickname). She identified White in court as Sleepy.  They gave her money and asked her to run to the store and pick up some beer, which she did.  After bringing them the beer, she took her son and Misty's boys and went to Misty's so that the children could go to bed.  The three men remained at her home, but she asked them to be gone when she got back, because she had to work the next day.

When she came home in the middle of the night, Knighton's bag of personal belongings was still at her house, but the men were gone.  Early the next morning, Albemarle County Police spoke with her, and she learned that Knighton and Daniels were dead.  She did not tell the police that Knighton and Daniels had been at her home the previous evening.  A few days later, police interviewed her again.  By then, she knew that the police were looking for Sleepy, and she still did not inform the officers that all three men had been at her home earlier on the night that Knighton

and Daniels were killed.  She testified that she was afraid, because two of her friends were dead, and Sleepy was still out there, and he knew where she lived and that she had children.  She moved to a new home by the end of the month.  *Id.* at vol. IX, 2232–2260.

On cross-examination, Houchens admitted that she did not tell the police about Knighton, Daniels, and White being at her home until August 2013, after she had been arrested in July 2012 for aiding and abetting and conspiracy to commit robbery, based on the events of May 3, 2011.  She had spoken to the Commonwealth's Attorney under a use immunity agreement, in which anything she told the Commonwealth that day could not be used against her.  The charges against her had been dropped, but she knew that they could be refiled.  She acknowledged that the timeline to which she testified in court was approximately one hour later than the timeline originally given to the Commonwealth's Attorney but believed that her court testimony was more accurate.  She admitted giving Knighton's personal bag to Derrick, not to the police, and she admitted that she had seen Sleepy's picture all over the television.  Finally, she admitted that she never saw any of the men with a gun that evening.  She denied knowing Lisa Hwang or ever meeting her.  *Id.* at vol. IX, 2261–2286.

Other testimony at trial indicated that Knighton, Daniels, and John Carter had been involved in some home invasion robberies of drug dealers' houses earlier in

the day on May 2, 2011.  In support of the theory that Frye and Roy were burglarized by mistake, the Commonwealth presented the testimony of Whitley Jackson. Jackson was the live-in girlfriend of Brian Dudley, a drug dealer, who had buried $10,000 in his yard for safe keeping.  Dudley and his brother-in-law, Jermaine Jones, worked together in their drug enterprise.  Jones was married to Dudley's half-sister, Tomika.  Tomika's cousin, John Carter, had helped Dudley and Jones carry a large bag of marijuana to Dudley's home before May 2, 2011.  Just before 2:00 a.m. on May 3, 2011, Jackson awoke to hear glass breaking in the living room.  Someone had kicked in the glass in one of the panels on the front door.  She did not see who did it and did not see any cars leave the area, but she was hiding in the hallway, trying to stay out of sight.  She was afraid of getting killed if the intruders had broken in.  She called her sister, told her what happened, and asked her sister to come get her.  Her sister arrived within fifteen minutes and drove Jackson, Dudley, their child, and a guest to her mother's house on Ford Avenue, just ten minutes away.  As they were approaching her mother's house, she noticed police at the next-door neighbor's house, the home of Jermaine and Martha Frye.  She noted at that point that Dudley's half-sister and Jermaine Jones lived on the other side of her mother's house.  She and Dudley did not report the attempted break-in at their house to the police.  At the end of May, police executed search warrants at Dudley's home and Jones' home

simultaneously, and both men were serving federal prison sentences at the time of White's trial.  *Id.* at vol. IX, 2206–2223.

The Commonwealth finished presenting its evidence on October 2, 2013, and evidence on White's behalf was introduced on October 3, 2013. Following closing arguments on October 7, 2013, the jurors deliberated, finally returning their verdicts late in the day.  The jurors convicted White of armed statutory burglary, attempted robbery, use of a firearm in the attempted robbery, possession of a firearm by a convicted felon, first degree murder of Lisa Hwang, use of a firearm in that murder, second degree murder of Dustin Knighton, use of a firearm in that murder, second degree murder of Brian Daniels, and use of a firearm in that murder. The jury acquitted White of the aggravated malicious wounding of Willie Roy.

### G. Sentencing.

On October 8, 2013, the jury presided over the sentencing phase of the jury trial.  The Commonwealth introduced evidence of White's prior convictions, mostly misdemeanors and drug offenses.  On White's behalf, his attorneys introduced the testimony of Thistle Newcomb, who had been White's foster care worker in 1999. She testified that White was placed in foster care at age eight because his mother had drug problems and could not provide for his care.  When White was eleven years old, in 1996, he was placed in a foster home with Mr. Rowzie as his foster parent. He had been in that placement approximately four years when he began running

away.  Later, it was determined that he had been sexually abused by Rowzie.  White was diagnosed with post-traumatic stress disorder.  Even before living with Mr. Rowzie, White had been diagnosed as mentally retarded or borderline retarded.  *Id.* at vol. XIII, 2737–2743.

The next defense witness, Captain David Roach of the Greene County Sheriff's Office, had been a lieutenant back in the late 1990s.  While assisting federal authorities in an investigation of Rowzie, he became aware that Rowzie had sexually abused White, as often as weekly, during the time that White was placed in Rowzie's home from age eleven through age fourteen.  Roach described the abuse as violent, involving rape and sodomy, and he testified that Rowzie handcuffed White to an iron bed when White resisted.  Rowzie was subsequently convicted and was then serving time in the state penitentiary.  *Id.* at vol. XIII, 2744–2747.

The jury returned the following sentencing recommendations: For felon in possession of a firearm, two years; for armed statutory burglary, twenty years; for attempted robbery, two years; for using a firearm in attempting to commit robbery, three years; for the first degree murder of Lisa Hwang, twenty-five years; for use of a firearm in commission of that murder, three years; for the second degree murder of Dustin Knighton, five years; for the use of a firearm in commission of that murder, three years; for the second degree murder of Brian Daniels, ten years; for use of a firearm in commission of that murder, three years.  *Id.* at vol. XIII, 2763–2764.  The

sentences recommended were the minimum sentences in the statutory sentences available, except for the murder of Ms. Hwang and the murder of Mr. Daniels, for both of which they recommended a sentence five years above the minimum.

After releasing the jury, the Court ordered a presentence report, and the matter was scheduled for hearing on January 15, 2014. The Commonwealth introduced the presentence report through the probation officer and proffered the victim impact statement from the Daniels family. The discretionary sentencing guidelines recommended a sentence between 52 years, 5 months and 87 years, 5 months, with a midpoint of 69 years, 11 months.

The defense introduced the testimony of Joette James, a clinical neuropsychologist, who thoroughly examined White and White's background in 2012. Based on her examination of White, tests administered to White, White's school records, medical records, social service/foster care records, and feedback from his sister, two teachers, and an employer, Dr. James concluded that White is intellectually disabled, falling in the range of mildly mentally retarded. Further, he suffered from post-traumatic stress disorder, likely compounded by his intellectual deficits in coping with the stressors to which he was exposed. She noted that records documented that his mother drank alcohol and used cocaine during her pregnancy, and that White was exposed to cocaine in utero. White's father was in and out of jail, and his mother was deteriorating because of drug use. His mother had a series

of abusive boyfriends, and White was physically abused and saw his mother thrown into the wall.  The children were largely unsupervised, and White sometimes stole food to feed his siblings.  White's paternal grandparents cared for him for a period, but the grandfather was strict and abusive, threatening him with a chainsaw and beating him with a belt.  His foster care experiences left him with nightmares, fear of sleeping, and hypervigilance bordering on paranoia.  *Id.* at vol. XIV, 2782–2824.

The defense requested a sentence below the guidelines, but the trial court imposed the sentences recommended by the jury, totaling 76 years, well within the guideline range.

## H. Direct Appeals.

White appealed his convictions and sentence to the Court of Appeals of Virginia, alleging that (1) the trial court erred in denying the motion to dismiss because of Shifflett's intentional theft of potentially exculpatory evidence, (2) the trial court erred in denying the motion to dismiss or to exclude Roy's testimony because of the technical problems with the videotape of Roy's statement to police, and (3) the evidence was insufficient to prove beyond a reasonable doubt that he committed the crimes.  By per curiam order entered May 4, 2015, the court denied White's appeal. Va. Ct. App. R.[3] 127–134.  On October 26, 2015, White's request

---

[3] Citations to the record from the Court of Appeals of Virginia will be abbreviated as "Va. Ct. App. R."  Citations to the state habeas record in the Supreme Court of Virginia will be abbreviated "Habeas R." for items entered June 15, 2017, through March 15, 2019,

for consideration by a three-judge panel was also denied. *Id.* at 140. White's petition for appeal to the Supreme Court of Virginia was refused on June 17, 2016. *Id.* at 143.

### I.  State Habeas Proceedings.

On June 15, 2017, White filed a petition for habeas corpus in the Supreme Court of Virginia. The issues raised therein have been raised in the current § 2254 petition and will be discussed in Section III. below. White moved to amend his petition on August 4, 2017, and again on January 23, 2018. Habeas R. 1521–1610, 3549–3554. Both motions were denied by the court. *Id.* at 3531, 3560.

On October 9, 2018, the Supreme Court of Virginia directed the Greene County Circuit Court to conduct an evidentiary hearing on a single issue in his petition, number 2B, whether trial counsel was ineffective in failing to call White's sister, Jasmine White, as an alibi witness. *Id.* at 3561–3562. The court appointed new counsel to represent White for the evidentiary hearing, which was held June 11, 2019. At the hearing, White, Jasmine White (sister), Kendra White (sister), Tina White (mother), Alonzo Cutchins (father), and Brandon Bates testified on White's behalf. Both defense counsel also testified. Defense counsel stated that they had met with Jasmine on two occasions each, as had other members of the defense team,

---

and "Habeas R. § 2" for items dated after March 15, 2019. Citations to the Greene County Circuit Court record in the state habeas case, Law No. 18-637, will be abbreviated "Cir. Civ. R."

including mitigation specialists in the office.  They did not think she would be a strong witness because details of her story kept changing. Further, they feared that her testimony would open the door to introduction of phone records that could be damaging to the defense, after counsel had successfully obtained a pretrial ruling precluding the Commonwealth from using the phone records in its case in chief. Notably, petitioner White and his father both acknowledged in their testimony that counsel told them they did not call Jasmine because they thought she would be a poor witness, and Cutchins also recalled the concern about the phone records.

Following the evidentiary hearing, the court rendered an opinion finding that defense counsel had made a reasonable investigation of the defense, reached reasonable conclusions about Ms. White's credibility, and made an appropriate strategic decision not to call her.  Accordingly, the court held that White had failed to prove ineffective assistance of counsel on this issue and entered an order in accord with that opinion on September 5, 2019. Cir. Civ. R. 266–277.

Thereafter, the Supreme Court of Virginia entered an order March 20, 2020, denying White's state habeas petition, finding that he had failed to prove ineffective assistance of counsel on any of the claims raised.  Habeas R. § 2, 933–1015.  White filed a petition for rehearing on April 14, 2020, which was denied October 8, 2020.

## II. Claims Asserted.

White raises the following claims in his timely filed petition in this court:

A.  Petitioner's pretrial counsel provided ineffective assistance of counsel at the preliminary hearing in questioning Willie Roy about the color of bandana worn by the assailant who struck him.

B1.  Ineffective assistance of trial counsel in failing to have a hearing on the motion to suppress Willie Roy's identification of White.

B2.  Ineffective assistance of trial counsel in failing to call White's sister, Jasmine White, as an alibi witness, and failing to call Brandon Bates, Kendra White, Tina White, Cleve Cush, and Alonzo Cutchin.

B3.  Ineffective assistance of counsel in failing to seek exclusion of the DNA results on the 9-mm pistol because forensic DNA examiner Angie Rainey testified that she would not have reported the test results because they did not meet quality control standards when she detected DNA consistent with two of her coworkers at the Division of Forensic Science in addition to DNA consistent with White, but her supervisor directed her to report the test results anyway.

B4.  Ineffective assistance of trial counsel in failing to object to the prosecutor's overstatement of the probative value of the DNA evidence used against White.

B5.  Ineffective assistance of trial counsel in failing to move to sever the charge of felon in possession of a firearm from the other charges and failing to object to inadequate redaction of the prior conviction to remove reference to a firearm.

B6.  Ineffective assistance of trial counsel in failing to object when Detective Snead testified that White refused to speak with him when he was arrested, in violation of the petitioner's Fifth Amendment right to remain silent.

B7.  Ineffective assistance of trial counsel in arguing to the jury that Roy was mistaken, not that he was lying.

B8.   Ineffective assistance of trial counsel in failing to introduce evidence and argue that White had never worn glasses until a year after he was incarcerated.

B9.   Ineffective assistance of trial counsel in failing to cross-examine former evidence custodian, James Shifflett, about lying on his job application to the Sheriff's Office.

B10.  Ineffective assistance of trial counsel in failing to move for the prosecutor to recuse himself so that they could subpoena him to explain why he tried to coach witness Greg Snow into saying he saw more than he said he saw and why he told Junior Snow not to talk to White's attorneys.

B11.  Ineffective assistance of trial counsel in failing to cross-examine Greg Snow and Junior Snow about the prosecutor's alleged improper efforts to influence their testimony.

B12.  Ineffective assistance of trial counsel in failing to object to the prosecutor's statement in closing argument that "there's an illusion to the fact that the petitioner and the decedents might have been friends but really the evidence in this case is that they were mere acquaintances." Br. Supp. Pet. 33, ECF No. 1-1.

B13.  Ineffective assistance of trial counsel in failing to elicit testimony from Jessica Houchens that she had written a letter to the Commonwealth's Attorney about White's relationship with the decedents.

B14.  Ineffective assistance of trial counsel in failing to object to improper voir dire questions by the prosecution.

B15.  Ineffective assistance of trial counsel for failing to object to the prosecutor's "lies to the jurors during voir dire that only money was stolen from the evidence room by former evidence, [sic] custodian, James Shifflett." *Id.* at 36–37.

B16.  Ineffective assistance of trial counsel in failing to inform the jurors that the petitioner was mentally retarded and thus did not

have the mental capacity to have intent to commit first or second-degree murder.

B17.   Ineffective assistance of trial counsel in failing to ask for a curative instruction after objecting to the prosecutor's improper remarks during closing argument, telling the jurors that it was their duty to convict.

B18.   Ineffective assistance of trial counsel for failing to object to the prosecutor's "lie to the jurors during closing argument, that Jermain [sic] Frye, stated during the 911 phone call that 'the first intruder had a white shirt or something on his face, and the other one I think was a black shirt but I'm not sure. I couldn't really see him.'" *Id.* at 38.

B19.   Ineffective assistance of trial counsel for failing to object to the prosecutor's reference to defense arguments as distractions or illusions.

B20.   Ineffective assistance of trial counsel in failing to object to the Commonwealth's Attorney vouching for the credibility of witness Jessica Houchens.

B21.   Ineffective assistance of trial counsel in failing to move for a new trial based on new evidence that juror Christopher North stated that White's criminal history was given to the jurors during the guilt phase of the trial, and that White's record was one of the reasons he found White guilty.

B22.   Ineffective assistance of trial counsel in failing to call Jack Sapin as a witness.

B23.   Ineffective assistance of trial counsel in failing to elicit testimony that an unknown person went in and out of the evidence room containing the evidence in White's case nine different times on two different days, for a total of eighteen unauthorized entries into the evidence room.

B24.   Ineffective assistance of trial counsel in failing to elicit testimony from forensic DNA expert Angie Rainey about two different

27

reports on the touch DNA on the steering wheel of Hwang's Honda.

B25. Ineffective assistance of trial counsel in failing to present evidence to the jury that White is mentally retarded, to go into detail about what that meant, and to ask that all of White's sentences be run concurrently.

B26. Ineffective assistance of trial counsel in failing to object to the judge's imposition of the jury's sentencing recommendation on the grounds that it is cruel and unusual and violates the Fourteenth Amendment right to due process to give a retarded person what amounts to a life sentence.

B27. The Supreme Court of Virginia allowed the Greene County Circuit Court to violate White's state and federal due process right to a fair evidentiary hearing on counsel's failure to call Jasmine White as a witness.

B28. White has been prejudiced by the cumulative effect of the claims made in his petition.

## III.   STANDARD OF REVIEW AND LIMITATIONS ON FEDERAL HABEAS.

A federal court may grant a petitioner habeas relief from a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal courts reviewing constitutional claims adjudicated on the merits in state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding." 28 U.S.C. § 2254(d)(1)–(2). There is a presumption of correctness that attaches to the state court's finding of facts, which can be overcome only by clear and convincing evidence. 28 U.S.C. § 2254(e). When reviewing a state court's assessment of an ineffective assistance of counsel claim, federal review is "doubly deferential," because the deferential standard of review under the statute overlaps with the deferential standard under *Strickland v. Washington*, 466 U.S. 668 (1984). *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).[4] In other words, the federal court is to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

A federal district court reviewing a § 2254(a) petition is also limited by the separate but related doctrines of exhaustion, procedural default, and independent and adequate state law grounds. The standard of review and these procedural doctrines promote the principles of finality, comity, and federalism, recognizing a state's legitimate interests in enforcing its laws, preventing disruption of state judicial proceedings, and allowing states the first opportunity to address and correct alleged violations of a state prisoner's federal rights. *Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991).

---

[4] Unless otherwise indicated, here and throughout this opinion, internal quotation marks, citations and alterations are omitted.

To exhaust his claims, a petitioner must present his federal constitutional claims to the highest state court before he is entitled to seek federal habeas relief. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Failure to do so "deprive[s] the state courts of an opportunity to address those claims in the first instance." *Coleman*, 501 U.S. at 732. When a petitioner has no more state remedies available, his claim has been exhausted. When the state court rules that a petitioner has procedurally defaulted his claims, those claims are simultaneously exhausted and defaulted. *Id.* Likewise, if the petitioner did not exhaust a claim before the state's highest court, and the claim would be procedurally defaulted if raised now in that court, the claim is simultaneously exhausted and defaulted.

A petitioner may be able to overcome procedural default if he can show good cause for the default and actual prejudice because of the claimed federal violation. *Id.* at 750. If the claim is a defaulted claim of ineffective assistance of trial counsel, the Supreme Court has adopted a special test for "cause and prejudice" in *Martinez v. Ryan*, 566 U.S. 1, 13–15 (2012). If a state post-conviction proceeding is the first time a petitioner is allowed by state law to raise an ineffective assistance of counsel claim, and the state post-conviction proceeding was the first time ineffective assistance of counsel was raised, if the petitioner had no counsel, or if counsel was ineffective within the meaning of *Strickland*, that is "cause" to overcome procedural default. The petitioner must also demonstrate that the claim for ineffective

assistance of trial counsel is a "substantial claim." *Martinez*, 566 U.S. at 13–15; *Trevino v. Thaler*, 569 U.S. 413, 423 (2013).

## IV.   ANALYSIS OF CLAIMS.

White has alleged twenty-nine claims in his petition, some with multiple subparts.  Almost all the claims allege ineffective assistance of counsel.  When reviewing counsel's performance, courts apply a highly deferential standard.  A petitioner must show that (1) counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth Amendment *and* (2) that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.  Petitioner must meet both prongs of the test.  Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing norms."  *Id.* at 688.  The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable strategy decisions.  *Id.* at 689–90.  To establish prejudice under *Strickland*, a petitioner must show that there was a "reasonable probability that . . . the result of the proceeding would have been different," which means "a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

In the context of federal habeas review of a claim for ineffective assistance of counsel, the question is not whether "a federal court believes the state court's

determination under the *Strickland* standard was incorrect, but whether that determination was unreasonable — a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "This double-deference standard effectively cabins our review to determining whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard." *Owens v. Stirling*, 967 F.3d 396, 412 (4th Cir. 2020) (emphasis added). "If this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "Section 2254(d) codifies the view that habeas corpus is 'a guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Valentino v. Clarke*, 972 F.3d 560, 581 (4th Cir. 2020) (quoting *Harrington*, 562 U.S. at 102–03). "Surmounting *Strickland'*s high bar is never an easy task," but "establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105.

While White raised most of his claims in his state habeas petition, making them appropriate for review under § 2254(d),  he failed to exhaust claims B3, B4, B5, B10, B24, B26, and a portion of B2.  I will address the properly exhausted claims first, but not in numerical order.  To avoid redundancy in the analysis, similar claims will be grouped together.

### A. Exhausted Claims.

### Claims A, B9, B11, and B13.

In each of these claims, White alleges that counsel was ineffective for either pursuing a particular line of questioning with a witness or failing to ask the witness certain questions.  Generally, decisions on what questions to ask or refrain from asking are matters of trial strategy, for which great deference is given to counsel. *Elmore v. Sinclair*, 799 F. 3d 1238, 1250 (9th Cir. 2015).  The question is whether counsel's decision is reasonable, in light of professional norms.  *Hunt v. Nuth*, 57 F.3d 1327, 1332–33 (4th Cir. 1995).  In each of these claims, the state habeas court found neither deficient performance nor prejudice. For the reasons set forth below, the state court decision is neither an unreasonable application of federal law nor an unreasonable determination of the facts.

### Claim A: Cross-Examination of
### Roy at Preliminary Hearing.

White alleges that the cross-examination of Roy was an effort to help the prosecution by putting words and ideas into Roy's mind while cross-examining Roy about the bandana worn by the dark-skinned intruder.  White notes that Roy initially described the assailant to the police as having a shirt over his head and face, but at the preliminary hearing, he said it was a bandana.  He theorizes that this testimony changed to match the evidence, since a bandana with White's DNA was found in Hwang's car.  Roy did not seem to remember the color of the bandana, and said it

was white.  Counsel questioned him at length about whether it was a white pattern on another color, and if so, what was the other color.  Roy said he was not sure. Counsel asked if it was black.  Roy still was not sure.

Roy was the only potential eyewitness trying to identify White and his clothing.  Testing the strength, accuracy, and certainty of his memory was an important part of counsel's job at the preliminary hearing and in preparing for trial. Further, the preliminary hearing is one of counsel's only opportunities to gain information about the prosecutor's case and its strength, especially in 2011, when discovery for defendants in criminal cases was extremely limited.  Without knowing as much as possible about the prosecutor's case, an attorney lacks the necessary information to provide the best advice to a client before trial.  The presence of a court reporter at the hearing served to lock Roy into his testimony, making it harder for the story to change later.  Because Roy said he was not sure of the color, and it was on the record less than six months after the burglary, any improved memory that Roy might experience by the time of trial two years later would be suspect.

White also argues that Roy testified at trial that the bandana was dark because of counsel's questions.  Roy testified that the bandana was black with a white pattern. Ct. Proc. Tr. vol. IV, 999.  In fact, the bandana was blue, and two years earlier, Roy could not recall what color it was. This allowed counsel to demonstrate how suggestible Roy was and how unreliable his memory was.

For all these reasons, the state court reasonably concluded that the questions counsel asked at the preliminary hearing were reasonable, strategic questions and that White suffered no prejudice.

### Claim B9: Failing to Question Shifflett about the Lie on his Employment Application.

The record and transcripts reflect that Shifflett was abundantly questioned about his embezzlement of funds from the evidence storage area in more than thirty cases, including White's, and his conviction for that crime. As the state court held, counsel could reasonably have concluded that further impeachment on an issue less directly relevant to the case would add little. Further, the Commonwealth had filed a motion in limine to preclude this evidence. Finally, because the impeachment would be cumulative, there is no prejudice to White from counsel's failure to pursue this line of inquiry. *Huffington v. Nuth*, 140 F.3d 572, 581 (1998). The state habeas court's opinion is neither an unreasonable determination of facts nor an unreasonable application of the law.

### Claim B11:  Failing to Question Greg Snow and Junior Snow about the Prosecutor's Interview with them.

Greg Snow discovered the bodies in the road as he was returning to his brother's house to retrieve his wallet. Concerned, he picked up his speed and rushed to his brother's house. His brother, Junior Snow, returned to the scene with Greg and called the police from his cell phone. Their testimony established when and

where the bodies were found and when the police were called.  Greg could not provide other details, such as the make of the car that sped past him, because it was too dark.  His description of the evening never changed.  As the state habeas court noted, counsel reasonably could have concluded that Greg's statement to the defense investigator that the prosecutor tried to get him to "say he saw more than he saw" was simply an expression of irritation at having been asked the same questions several times by a thorough prosecutor.  The state court was not unreasonable in holding that counsel's cross-examination was not deficient performance.

The investigator notes reflect that a friend in law enforcement told Junior not to talk to defense counsel.  Even if it were the prosecutor who had done so, Junior still spoke with defense counsel, and his information remained the same, whether talking to the police, the prosecutor, defense counsel, or in court.  Counsel could reasonably conclude that what the prosecutor may or may not have said to Junior was irrelevant to the case and would detract from the more important issues.  Again, the state court was not unreasonable in finding no deficient performance.

As noted earlier, neither witness implicated White as a person involved in the crimes.  Counsel could reasonably have chosen not to cross-examine at all, and there would be no prejudice to White.

### Claim B13: Failing to Cross-Examine Houchens about
### her Letter to the Commonwealth's Attorney.

White asserts that counsel should have elicited testimony from Houchens about her letter to the Commonwealth's Attorney, in which she stated that Knighton called White his "brother from another mother." White states that this would show that he and Knighton were close, not just mere acquaintances. What Knighton told Houchens is hearsay, whether she put it in a letter to the prosecutor or testified to it from the stand. *See Commonwealth v. Swann*, 776 S.E.2d 265, 268 (Va. 2015) (defining hearsay as testimony about a statement made outside of court "offered as an assertion to show the truth of matters asserted therein" and noting that this includes "testimony given by a witness who relates what others have told him"). She had met White for the first time on May 2, 2011, according to her testimony, although she had known Knighton since childhood. She had no personal knowledge of the relationship between White and Knighton. Had counsel tried to elicit the hearsay testimony from her, it would have been objectionable. There is nothing unreasonable in the state court's decision that counsel is not deficient for failing to ask an improper question. Because any objection to the effort to elicit such testimony would likely be sustained, keeping the information out of evidence, there is no prejudice to White arising from counsel's performance.

### Claims B1 and B21.

Both claims allege that counsel was ineffective for failing to file or argue motions.  Normally, decisions regarding what arguments to pursue and motions to file are committed to the authority of the attorney to make.  *Gonzalez v. United States*, 553 U.S. 242, 248 (2008).  Such matters are legal strategy, which the court should not interfere with unless the strategy is plainly unreasonable.  The state habeas court held that White failed to show deficient performance or prejudice on these claims.  The court's decision was well-reasoned and reasonable.

### Claim B1:  Motion to Suppress.

Counsel filed a motion to suppress Roy's photo identification of White and to prohibit Roy from making an in-court identification.  As discussed in the pretrial proceedings, counsel and the prosecution entered an agreement just before the hearing on the motion.  The agreement was that no evidence would be introduced regarding Roy's photo lineup identification, nor would Roy make an in-court identification of White.  Roy would be permitted to describe the attacker and noticeable features, and to identify specific features of White that resembled features on the attacker.

The state court reasonably noted the difficulty of prevailing on a motion to suppress an identification, and that counsel could reasonably conclude that he might not win the motion.  Even if counsel won the motion to suppress, the court noted

that Roy still would have been permitted to describe the assailants and their clothing. For that reason, the court reasonably concluded that counsel's strategy was reasonable, and that White did not suffer any prejudice from counsel's decision. Quite the opposite, declining such an agreement and pursuing the motion could well have produced much worse results.

## Claim B21:  Motion for New Trial.

White argues that counsel should have filed a motion for a new trial based on an interview with juror North, in which he indicated that White's criminal record played a role in North's decision to convict him.  None of the other jurors reported seeing White's criminal history before the sentencing hearing, and the court records and transcripts do not show this record being admitted until the penalty phase of the trial.  The state court held that counsel may reasonably have decided that North was confused or thinking only about the single felony conviction introduced to show that White was prohibited from carrying a firearm.  Counsel may also have determined that the chances of prevailing on such a motion were low, and therefore not the best use of his time while preparing for the sentencing hearing. This decision is not an unreasonable determination of facts nor an unreasonable application of law.

## Claims B2 and B22.

These claims allege ineffective assistance of counsel for failing to introduce testimony of identified witnesses, Jasmine White and Jack Sapin.  Evaluating the

testimony of prospective witnesses is a matter of strategy entrusted to the professional judgment of trial counsel. *United States v. Dehlinger*, 740 F.3d 315, 325 (4th Cir. 2014). The state habeas court found that counsel reasonably exercised discretion in their decisions not to call White or Sapin.

### Claim B2:  Jasmine White.

White alleges that Jasmine should have been called as an alibi witness. At the evidentiary hearing, counsel testified that several members of the defense team met with Jasmine more than once. They had concerns about her credibility because of her demeanor and inconsistent statements. Further, they were concerned that her testimony would open the door to admission of previously excluded telephone records, showing several family phone calls around 3:45 a.m. on the night of the murders. The state court found these to be legitimate strategic concerns. This court cannot say that this finding is unreasonable. Counsel's decision whether to call a witness is a strategic decision that demands "the assessment and balancing of perceived benefits against perceived risks" and is a decision "to which we must afford . . . enormous deference." *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004).

### Claim B22:  Jack Sapin.

White asserts that Sapin should have been called to testify about John Carter and another man coming by his home, with blood on their clothing, and saying that

they had just killed the victims at Knighton's home and then dumped them on Octonia Road.  They also said that White had driven them to the scene and that they had left White on Octonia Road.  Counsel interviewed Sapin at the regional jail, where he had been incarcerated for nearly a year on drug charges.  They noted that the crime details allegedly provided to Sapin by Carter were inconsistent with the physical evidence and other evidence in the case.  Further, Carter had recently robbed Sapin's girlfriend, giving him an axe to grind against Carter.  Finally, counsel was not comfortable with testimony that placed White at the scene when the crime occurred.  As a strategic matter, they decided not to call him.  The state court found this to be a reasonable strategic decision.  I cannot say that the state court's decision is unreasonable.  *Id.*

The state court also found no prejudice to White from this strategic decision.  I cannot find this decision unreasonable either.  First, what Carter told Sapin would be hearsay.  Carter's statements would not be admissible under the statement-against-penal-interest exception to the hearsay rule unless Carter were unavailable to testify and other evidence in the record could corroborate the reliability of the statements.  *Bailey v. Commonwealth*, 749 S.E.2d 544, 546 (Va. Ct. App. 2013). The major discrepancies between Carter's alleged version of events and the physical evidence at the crime scene would not support a finding of reliability.  Without

Carter's statements, the fact that he went to Sapin's house with blood on his clothing would not be probative of much.

### Claim B6:  Failure to Object.

White alleges that counsel was ineffective in failing to object when Detective Snead testified that White refused to speak with them at the time of his arrest. Counsel did object and moved for a mistrial, out of the jury's presence, once the witness was off the stand.  The trial court, noting that the testimony was made in passing when the detective was summarizing the arrest procedure, found that White was not prejudiced by the inadvertent reference.  The court found the objection untimely (because not made immediately during the testimony) and the motion to be without merit.  The court did offer to give a curative instruction, which counsel declined, because he did not want to highlight the testimony in the jurors' minds, which was the same reason he waited to raise the objection until the jury was on break.

The state habeas court found that counsel's performance was not deficient, and that White was not prejudiced.  Those findings are reasonable.  Decisions on what evidentiary objections to raise are within the province of counsel's discretion and will be upheld if reasonable.  *Gonzalez*, 553 U.S. at 248–49.  *See also DeCastro v. Branker*, 642 F.3d 442, 451 (4th Cir. 2011) (finding that waiting to raise an objection out of the jury's presence was a reasonable tactical decision); *Noland v.*

*French*, 134 F.3d 208, 216–17 (4th Cir. 1998) (finding no prejudice or exploitation of defendant's exercise of Fifth Amendment rights when just mentioned in a summary of the arrest procedure).

### Claim B7:  Vouching for State Witness.

White alleges that counsel was ineffective when he "vouched" for Roy's credibility by saying that he was not calling Roy a liar.  The state habeas court found neither deficient performance nor prejudice, noting that judicial review of counsel's closing argument is to be highly deferential.   *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003).  Because Roy was the victim of a violent crime and did not know White or have any reason to lie about White, counsel could reasonably have concluded that calling him a liar would be a poor strategy and might have antagonized the jury.  The court agrees that the state court's analysis was eminently reasonable.  Counsel did not vouch for Roy's credibility.  Credibility is a concept with many connotations, and truthfulness is only one of them.  Counsel argued that Roy's testimony was not reliable, because his opportunity to observe was limited, he was terrified and in pain, and the incident happened two and a half years before the trial.  A person can be truthful but still give a completely wrong description of events, and that is the point counsel made to the jury.  White was not prejudiced by counsel's tact; to the contrary, attacking the victim's truthfulness would have been far more likely to anger the jury.

## Claims B8 and B23.

These claims both involve allegations that counsel should have presented additional evidence.   Again, the state habeas court found neither deficient performance nor prejudice, respecting counsel's strategic decision on handling these evidentiary matters, which are committed to the discretion of counsel.  *Gonzalez*, 553 U.S. at 248–49.

## Claim B8:  White's Eyeglasses.

At trial, White wore glasses.  For the first time, Roy testified that the assailant who hit him wore glasses.  Defense counsel impeached him by demonstrating the number of different times Roy had spoken to police and  prosecutors and testified in court.  On none of these prior occasions had Roy mentioned the suspect wearing glasses.  Even when police asked him in a recorded interview if there was anything distinctive about the intruder's eyes, Roy had never mentioned glasses.

White contends that counsel should have introduced evidence that White never needed glasses until a year before the trial, when counsel assisted White in getting an eye exam and glasses.  Before the state court, White apparently argued that counsel himself should have testified, but he did not make that argument here. Instead, White referenced medical records that never mentioned glasses and the receipt for purchase of the glasses he was wearing, which were purchased long after the burglary of Roy's home.  The state habeas court noted that White's property at

the jail, returned to him on April 12, 2011, just three weeks before the crimes of May

3, 2011, included a pair of glasses.  Any claim that White never wore glasses before

would have certainly opened the door to evidence of the glasses in his possession

before the crimes.  Whether he needed glasses and whether he wore glasses are

subtly different issues.  I cannot say that the state court's decision about counsel's

strategic choice was unreasonable.    White failed to establish either deficient

performance or prejudice.

### Claim B23:  Unknown Person Entering Evidence Storage Room.

White alleges that there is a video showing an unknown person entering the

evidence room nine times on two different days (total of eighteen entries).  During

the state investigation of Shifflett, that video allegedly went missing.    White

speculates that the video would show Detective Snead entering the evidence room.

Even if that were shown, that would not be improper, as Detective Snead was

authorized to enter the room.  There is no allegation that the video showed anyone

removing something from the evidence room or otherwise tampering with the

evidence.  For that matter, there is no identification of who viewed the video or saw

what was on it, and without this knowledge, one can only speculate whether the

video contained anything of value to the defense.  Counsel cannot introduce what is

not available, nor can counsel ask the jury to speculate that it would have shown

someone tampering with evidence.  There must be proof of something from which

an inference can be drawn.  The state court's conclusion that White failed to present sufficient factual allegations to support this claim is not unreasonable.  Without specific allegations of what the evidence would show — beyond someone entering the room—White cannot demonstrate deficient performance or prejudice. *Muhammad v. Warden*, 646 S.E.2d 182, 195 (Va. 2007).

### Claims B14 and B15.

White alleges that counsel was ineffective in failing to object to the prosecution's statements and questions regarding a witness' theft of money from the evidence room.  The state habeas court found neither deficient performance nor prejudice on these claims.

### Claim B14:  Question to Jurors.

The prosecution asked prospective jurors Morris, Duncan, and Rodriguez, individually, questions about whether knowing that Shifflett had taken cash from the evidence room would automatically taint their view of all the evidence.  The Commonwealth's Attorney asked Morris if he "would be able to keep an open mind and view all the evidence to determine whether the evidence . . . that we're seeking to introduce was properly handled, aside from the stolen cash that was missing?"  Ct. Proc. Tr. vol. III, 641.  He asked Duncan "Have you formed or expressed any opinion about whether or not stealing cash from the evidence room would translate into tainting of all of the evidence in this case?"  He followed up by asking if she could

keep an open mind about the issue.  *Id.* at vol. III, 724.  Finally, the prosecutor asked Rodriguez "If there were to be evidence presented in this case that some evidence was tainted, in particular cash . . . evidence was tainted, would you still be about [sic] to keep an open mind . . . about the rest of the evidence presented in the case?"  *Id.* at vol. III, 819–820.

In finding that counsel's performance was not deficient, the state habeas court stated that the voir dire questions were proper.  Under Virginia law, "the court must afford a party a full and fair opportunity to ascertain whether prospective jurors stand indifferent in the cause, but the trial judge retains the discretion to determine when the parties have had sufficient opportunity to do so."  *Commonwealth v. Hill*, 568 S.E.2d 673, 675 (Va. 2002).  If the state court has said that the questions were proper, it is "not the province of a federal habeas court to reexamine" the state law issue.  *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).  The state court's determination that counsel was not deficient for failing to object to a proper question is reasonable.  Because the question was proper, White has not been prejudiced by counsel's failure to object.

### Claim B15:  "Lies" to the Jury.

White alleges that the prosecution lied to the jurors by telling them that Shifflett stole only money from the evidence room.  The state habeas court's finding of no deficiency and no prejudice are not unreasonable.  Although evidence at trial

revealed that some other evidence was missing, including a video recording of Jennifer German's photo lineup, these items were not connected to Shifflett.  The video recording equipment was replaced in 2012 or 2013, and recordings from 2009 through 2012, believed to have been transferred to the new system, disappeared. This was a different issue from Shifflett's theft.  There was no evidence that Shifflett tampered with any other evidence, and thus, no reason for counsel to object to the prosecution's statement.

### Claims B16 and B25.

White alleges that counsel was ineffective in failing to present evidence of his mental retardation to the jury.

### Claim B16:  Guilt Phase.

White alleges that counsel should have introduced evidence of his retardation during the guilt/innocence phase of his trial.  Understandably, White argues that retardation should be relevant to show that he lacked the capacity to form a specific intent to kill.  However logical that argument might be from a scientific perspective, Virginia follows the common law, which does not allow evidence of intellectual disability or even mental illness, short of legal insanity, to be considered in determining a person's guilt or innocence.  *Peeples v. Commonwealth,* 519 S.E.2d 382, 383 (Va. Ct. App. 1999) (en banc) (upholding trial court's exclusion of expert testimony that defendant had an I.Q. of 55 and "extreme difficulty correctly

interpreting social situations").  Virginia has not adopted "diminished capacity" as a

defense, although some states have chosen to do so, because:

> The state of knowledge in the fields of medicine and psychiatry is subject to constant advance and change.  The classifications and gradations applied to mental illnesses, disorders, and defects are frequently revised.  The courts cannot, and should not, become dependent upon these subtle and shifting gradations for the resolution of each specific case.

*Stamper v. Commonwealth*, 324 S.E.2d 682, 688 (Va. 1985).  In the landmark case

holding that execution of the mentally retarded is unconstitutional, the Supreme

Court stated that "[t]heir deficiencies do not warrant an exemption from criminal

sanctions, but they do diminish their personal culpability."  *Atkins v. Virginia*, 536

U.S. 304, 318 (2002).

Defense counsel worked tirelessly in this case to establish White's intellectual

deficiency, getting the Commonwealth to drop its request for the ultimate sanction

of death.  The state habeas court correctly recognized that counsel's conduct was not

deficient.  Counsel is not deficient for failing to offer inadmissible evidence.  Nor

was White legally prejudiced.

**Claim B25:  Sentencing Phase.**

White contends that counsel was ineffective at the sentencing phase in failing

to "present information to the jurors that the petitioner was found to be mentally

retarded and to go into detail about what that meant and failed to ask that all of the

petitioner's sentences should be ran [sic] concurrent."  Br. Supp. Pet. 45, ECF No.

1-1.  As the state habeas court recognized, counsel introduced evidence of White's retardation through Thistle Newcomb, White's foster care case worker in 1999. Although she did not go into the level of detail as Dr. James at the later sentencing hearing, counsel could reasonably conclude that existing records predating the crimes would be more persuasive than the testimony of an expert appointed specifically for trial.  I find nothing unreasonable in the state court's conclusion that counsel was not deficient.

Further, contrary to White's assertion, the jury has no power to impose concurrent sentences.  *Harrison v. Commonwealth*, No. 1992-03-1, 2004 WL 2513915, at *1 (Va. Ct. App. Nov. 9, 2004) (unpublished).   The legislature determines the procedures for setting a sentence, and the legislature empowers the jury to determine the punishment within the limits prescribed by law.  Va. Code Ann. § 19.2-295.  Once the jury determines a sentence, the court has the final power to modify it, either by suspending a portion of the sentence or by running sentences concurrently.   Va. Code Ann. §§ 19.2-303, 19.2-308.   Regarding concurrent sentences, the legislature has established that "When a person is convicted of two or more offenses, and sentenced to confinement, such sentences shall not run concurrently, unless expressly ordered by the *court*."  Va. Code Ann. § 19.2-308 (emphasis added).  Some offenses cannot be run concurrently at all because of statutory mandate.  For example, use of a firearm in the commission of certain

felonies carries a mandatory sentence which "shall be separate and apart from, and shall be made to run consecutively with, any punishment received for the commission of the primary felony." Va. Code Ann. § 18.2-53.1. Four of White's convictions fall under this statute, and even the court cannot run those sentences concurrently with the others. Accordingly, White cannot establish prejudice because counsel failed to ask the jury to recommend concurrent sentences. Even if the request had been made, the court would not be bound to follow it. *Harrison*, 2004 WL2513915, at *2.

### Claims B12, B17, B18, B19, and B20.

Each of these claims involves allegations that counsel was ineffective for failing to object to portions of the prosecution's closing arguments. The state habeas court found that counsel appropriately exercised professional discretion in carrying out their professional duties and that White suffered no legal prejudice. Generally, whether and when to object to arguments of counsel are committed to the sound discretion of the attorney. Such strategically made choices are "virtually unchallengeable." *Sigmon v. Stirling*, 956 F.3d 183, 195 (4th Cir. 2020). For the reasons stated below, I conclude that the state court's decision on these issues is not unreasonable.

## Claim B12:  Just Acquaintances.

White alleges that counsel was ineffective in failing to object to the prosecution's rebuttal closing argument, stating that "the evidence in this case is that they were mere acquaintances."  Br. Supp. Pet. 33, ECF No. 1-1.  A prosecutor has the right in rebuttal to answer any argument made by the defense and to refer to the evidence and inferences from the evidence in doing so.  *Clozza v. Commonwealth*, 321 S.E.2d 273, 281 (Va. 1984).  The state court noted that counsel could reasonably have believed that the argument was a proper response to counsel's arguments, and thus, there was no reason to object.  The state court's decision is not an unreasonable interpretation of the facts nor unreasonable application of the law.

## Claim B17:  Curative Instruction.

White alleges that counsel was ineffective in failing to request a curative instruction when the prosecutor argued to the jury that it was their "duty to convict." Br. Supp. Pet. 38, ECF No. 1-1.  Counsel objected to the statement when it occurred, but the judge overruled the objection, saying it was argument.  Because the judge overruled the objection, there was no reason to believe that he would grant a curative instruction.  Counsel is not required to make a pointless motion.  *United States v. Mason*, 774 F.3d 824, 833 (4th Cir. 2014).  The state court's decision in rejecting this claim was not unreasonable.

### Claim B18:  "Lies" about Frye's Testimony.

White alleges that the prosecution lied to the jury, telling them that Frye told the 911 operator that the first intruder had a white shirt on his face and the other one had a black shirt, he thought, but he couldn't be sure because he couldn't really see him.  The state habeas court observed that in the 911 transcript, Frye said that one had a white shirt on his face and the other had a black shirt, but he could not say who had which one.  The state court also emphasized that the prosecutor urged the jurors to look at the 911 transcript, which was in evidence, to see for themselves what Frye had said.  The court concluded that counsel reasonably could have concluded that the prosecutor did not materially misstate the evidence and that White suffered no prejudice, because an objection was not likely to affect the outcome of the case.  I cannot say that these findings are unreasonable.

### Claim B19:  Distractions and Illusions.

White contends that counsel was ineffective for not objecting to the prosecution's characterization of the defense arguments as distractions and illusions. The state habeas court found the prosecution rebuttal arguments to be properly responsive to the defense arguments in the case.  *See Clozza*, 321 S.E.2d at 281.  For every item that defense counsel had suggested should be reasonable doubt, the government argued the evidence supporting its explanation of why the defense argument of reasonable doubt lacked merit.  That was the prosecutor's right and

duty.   Calling the defense argument "a distraction" is comparable to calling the argument a "red herring," something that has appeal on first glance, but really does not matter in the scheme of things.   The state also found that White suffered no prejudice, because an objection from counsel would not likely have changed the outcome of the trial.

### Claim B20:  Failure to Object to Vouching.

White contends that counsel was ineffective in failing to object to the prosecution vouching for witness Houchens' credibility.  A prosecutor is not allowed to vouch for his witness.  *United States v. Johnson*, 587 F.3d 625, 632 (4th Cir. 2009); *United States v. Sullivan*, 455 F.3d 248, 259 (4th Cir. 2006).  Vouching occurs when the prosecutor's questions, comments, or arguments to the jury would lead jurors to reasonably believe that the prosecutor was indicating his personal belief in the credibility of the witness.  *Johnson*, 587 F.3d at 632; *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993).  The state habeas court held that the prosecutor did not vouch for Houchens, but simply responded in rebuttal to defense arguments that she should not be believed.  The prosecutor did not indicate his personal belief in Houchens; rather, he argued the reasons that the jury should believe her based on the evidence.  Because he was not vouching improperly, there was no reason for defense counsel to object.  Nor would counsel's objection been likely to have changed the

outcome for White.  I find the state court's determination of facts to be reasonable, and the state court's application of law was also reasonable.

### Claim B27:  Due Process Violation.

This claim does not allege ineffective assistance of counsel.  Rather, White alleges that the Supreme Court of Virginia and the Greene County Circuit Court violated his right to Due Process and a fair evidentiary hearing on his habeas claim, apparently by not considering the other witnesses and arguments that White wanted to raise at the evidentiary hearing.  Regardless of the merits of this complaint, it is not a proper issue for habeas review.  Alleged violations of due process in state habeas proceedings are not cognizable on federal habeas review because there is no constitutional right to post-conviction proceedings in state court.  *Lawrence v. Branker*, 517 F.3d 700, 717 (4th Cir. 2008).  Accordingly, this claim must be dismissed.

### Claim B28:  Cumulative Prejudice.

White's final claim alleges cumulative prejudice from claims B1 through B27. The Fourth Circuit has rejected cumulative error analysis, noting that an attorney's actions or omissions that are not unconstitutional individually cannot be added together to create a constitutional violation.  *Fisher v. Angelone*, 163 F.3d 835, 852–53 (4th Cir. 1998).  If the court adopted cumulative error analysis, the "analysis

evaluates only effect of matters determined to be error, not cumulative effect of non-errors." *Id.*

Because the state court's determination that White has failed to establish deficient performance or prejudice on the above claims is neither an unreasonable determination of fact nor an unreasonable application of federal law, I will dismiss claims A, B1, B2 (partial), B6, B7, B8, B9, B11, B12, B13, B14, B15, B16, B17, B18, B19, B20, B21, B22, B23, and B25.  I will dismiss claim B27 as non-cognizable in federal habeas.  I will dismiss claim B28 because cumulative-error analysis is inapplicable in this case and is not recognized in this circuit.

## B. Unexhausted/Defaulted Claims.

Claims B3, B4, B5, B10, B24, B26, and part of B2 were not exhausted.  White contends that he tried to amend his state habeas petition to add claims B3, B4, and B5, but that his motion to file an amended petition was denied.  As the respondent asserts, the motion to amend the petition was filed more than a month after the statute of limitations for filing state habeas claims had run.  Amendments with new claims do not relate back to the filing of the original petition, and therefore, the claims were already defaulted by the time White attempted to assert them.  For each of these unexhausted claims, I must determine whether White can overcome his procedural default.

At the outset, I find that *Martinez* applies the appropriate standard for determining if White overcomes his procedural default. *Martinez* allows a federal habeas court to consider defaulted claims on the merits if (1) the ineffective assistance of counsel claim is a "substantial claim;" (2) the "cause" for default is the lack of counsel or ineffectiveness of counsel at the initial state habeas proceeding, under the standards of *Strickland*; (3) the state post-conviction proceeding was the first time ineffective assistance of counsel was raised; and (4) the state post-conviction proceeding was the first one in which petitioner was actually or effectively allowed by state law to raise the claim. *Martinez*, 566 U.S. at 13–15.

Three of the *Martinez* prongs clearly apply here. At the time White filed his state court petition, he had no attorney. The state appointed him an attorney only after referring the matter to the Circuit Court for an evidentiary hearing on a single issue. White's lack of counsel and attendant lack of knowledge of the law is the cause for his failure to raise the defaulted claims in his initial petition. Likewise, White's state post-conviction proceeding was the first time he raised any issues of ineffective assistance of counsel, and under Virginia law, that is the first time that ineffective assistance claims can be raised. *Blevins v. Commonwealth*, 590 S.E.2d 365, 368 (Va. 2004). The remaining requirement for White to overcome procedural default is that his claims must be "substantial," meaning that the claim must have

some merit. *Martinez*, 566 U.S. at 14. For the reasons stated below, I find that none of White's claims are substantial.

### Claim B2:  Failing to Call Kendra White, Tina White, Brandon Bates, and Alonzo Cutchins as Witnesses.

The transcript from the evidentiary hearing in Greene County Circuit Court makes it abundantly clear that counsel regularly spoke with White's family members, including Cutchins, throughout the investigation and preparation of the trial. Introducing testimony from any of the family members risked opening the door to the phone records. Cutchins testified that counsel had explained his concern about the phone records coming in, but Cutchins said it was not unusual for his children to call him in the middle of the night.

Although Bates said that he had spoken to the defense twice, counsel did not recall speaking with him. Further, counsel testified that Jasmine never told him that Bates was home with her the night of the crime, and White never named Bates as a potential witness. Jasmine admitted that she did not tell counsel Bates was home.

From this evidence, it appears that counsel thoroughly investigated the case and made a tactical decision not to call the family members. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. . . ." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). The reasonableness of counsel's failure to call Bates must take into consideration the information they were given by their client and by Jasmine. *Huffington*, 140 F.3d at

581.  Because the evidence fails to demonstrate deficient performance, this claim has no merit and is not substantial.  White has failed to overcome his procedural default, and I will dismiss this claim.

### Claim B3:  Failing to Challenge the
### DNA Evidence on the Gun.

White argues that counsel should have filed a motion to exclude the DNA evidence linking him to the 9-mm pistol found at the crime scene.  The basis for his argument is that the bullet recovered from one of the victims, with no cartridge case, could not be *conclusively* tied to the 9-mm pistol.  However, the bullet was of a class used for "numerous calibers," including bullets for the 9-mm Luger.  Ct. Proc. Tr. vol. VII, 2144, 2155.  Evidence which tends to prove or disprove a material fact is relevant, and therefore admissible unless precluded by another rule of evidence. *McCloud v. Commonwealth*, 609 S.E.2d 16, 24 (Va. 2005).  That the bullet was consistent with those used for several different caliber guns goes to the weight of the evidence, not its admissibility.  Counsel extensively cross-examined the firearms expert at trial and argued to the jury the reasons the evidence should be discounted. Counsel were not required to file a futile motion to exclude relevant evidence. *Moody v. Polk*, 408 F.3d 141, 151 (2005).  Counsel's performance was not deficient.

Even without the bullet, the gun was found at the crime scene near one of the victims.  That alone makes the gun relevant and admissible, and if the gun was admissible, so was the DNA evidence.  Accordingly, White cannot show prejudice.

With neither deficient performance nor prejudice, this is not a substantial claim, and White has failed to overcome his procedural default. I will dismiss this claim.

### Claim B4: Failing to Challenge the Prosecutor's Overstatement of DNA Evidence Value.

The DNA evidence on the gun, steering wheel, pistol, and black tee shirt all had DNA mixtures from which White could not be excluded. The bandana, however, had a DNA mix in which White was identified as a major contributor, with a 1 in 6.5 billion probability of that DNA belonging to anyone else. It would be virtually impossible to overstate the value of that. While the other items, individually, may not have been as convincing, taken together with each other and with the bandana, the evidence is quite probative. There was nothing improper about the prosecutor's argument, and counsel was not deficient in failing to make a futile objection to it. *Id.* at 151.

### Claim B5: Failing to Move to Sever the Felon with a Firearm Charge.

There is no per se rule requiring severance of charges just because evidence of a previous felony, for purposes of establishing a felon in possession charge, could be prejudicial to the defendant. *United States v. Alexander*, 30 F. Supp. 3d 499, 503 (E.D. Va. 2014). When multiple charges share a factual basis that is part of the same criminal scheme or plan, it is not error to deny a motion to sever. *Id.* Severance is required only if there is a serious risk that a joint trial would prevent the jury from

making a reliable judgment about guilt or innocence.  *United States v. Hackley*, 662 F.3d 671, 684 (4th Cir. 2011).  Although giving a limiting instruction is the better practice when charges are not severed, it is not required when the gun is part and parcel of all the charges.  *United States v. Rhodes*, 32 F.3d 867, 872 (4th Cir. 1994).

Counsel requested a limiting instruction in this case, but the trial court denied the motion.  Ct. Proc. Tr. vol. VII, 1694–1696).  If the trial court felt no need to give the limiting instruction, then the court certainly would not have severed the charge. The proof that establishes White's possession of the gun is the same proof that establishes his involvement in the homicides.  Efficiency and judicial economy favor a single trial on charges related to one another because of a shared factual background.  Further, his prior conviction, possession with intent to distribute cocaine, was a non-violent conviction, not one likely to prejudice the jury against White on the violent charges in this trial.  Because White has failed to establish either deficient performance or prejudice from this claim, it is not a substantial claim, and he has failed to overcome his procedural default.  I will dismiss the claim.

### Claim B10:  Failing to Move
### to Recuse the Prosecutor.

White asserts that counsel was ineffective in failing to move to recuse the prosecutor and subpoena him to testify at trial.  The questions he says his attorney should have asked Mr. Morris, the Commonwealth's Attorney, are "Why he tried to coach Greg Snow into saying he saw more that he really saw" and "why he told

Junior Snow not to talk to [his] attorneys." The testimony that White proposes to introduce is irrelevant to the issues in the homicide case and is inadmissible. If the prosecutor had committed an ethical violation, why he did so would have nothing to do with whether White committed the homicides charged. As indicated previously, White did not establish any prejudice from the conduct he alleged. Greg and Junior Snow both spoke with defense counsel. They told counsel what they told police, and their trial testimony was no different. If White believes that the prosecutor acted unethically, unless the behavior prevented White from receiving a fair trial, then the allegations of prosecutorial misconduct are not relevant to his trial and need not be admitted. *See United States v. Caro*, 597 F.3d 608, 624 (4th Cir. 2010) ("In assessing alleged prosecutorial misconduct, [this court] ask[s] whether the misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process."). That being the case, counsel is not ineffective for failing to ask the prosecutor to be recused so that he can be interrogated about matters irrelevant to White's guilt or innocence of the crime charged. This claim is completely without merit. White has not overcome his procedural default, and I will dismiss this claim.

### Claim B24:  Failing to Impeach Agent Rainey with Second DNA Report.

White alleges that counsel was ineffective in failing to cross-examine Agent Rainey about the second DNA report from the steering wheel because Frye could not be eliminated as a contributor on one of the reports, but Frye was not mentioned

on the other.   As indicated previously, what lines of questioning to pursue—or refrain from pursuing—on cross-examination are tactical matters for which great deference is afforded to counsel.   *Gonzalez*, 553 U.S. at 248–49.   Ample reasons support a decision not to ask questions about the second report.   First, Officer Carol Townsend testified that she attempted to recover touch samples from more than one location on the steering wheel, so having a person's DNA on one section and not another is not necessarily inconsistent.   Second, having a DNA profile from which Frye could not be eliminated is not helpful to the defense, because it corroborates a connection between the home invasion and people in Hwang's car.   Finally, it would not change the outcome of the trial because DNA consistent with White was in both reports.   Because White has demonstrated neither deficient performance nor prejudice, this is not a substantial claim, and he has not overcome his procedural default.   I will dismiss this claim.

### Claim B26:  Failing to Challenge
### the Judge's Sentence.

White alleges that counsel was ineffective for failing to raise an Eighth Amendment challenge of cruel and unusual punishment when the court imposed a seventy-six-year sentence on a retarded person.   The claim is without merit. Intellectual disability is not a license to kill yet receive minimal incarceration.   Until the Court's decision in *Atkins* in 2002, the law permitted execution of criminals convicted of capital murder, notwithstanding mental retardation.   536 U.S. at 313–

15.  As recently as 1989, the Supreme Court had rejected the claim that execution of a mentally retarded person violated the constitution.  *Penry v. Lynaugh*, 492 U.S. 302, 334 (1989), *overruled by Atkins*, 536 U.S. at 321.  In finding that the lessened culpability of a retarded person renders the death penalty cruel and unusual, however, the Court also stated:

> Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. . . . [T]here is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.  *Their deficiencies do not warrant an exemption from criminal sanctions,* but they do diminish their personal culpability.

*Atkins*, 536 U.S. at 318 (emphasis added).

There may come a day when "evolving standards of decency that mark the progress of a maturing society" leads to limits on the length of sentence that may be imposed on an intellectually disabled individual.  *Trop v. Dulles*, 356 U.S. 86, 100–101 (1958).  That day is not here.  White emphasizes that he has the mental age of someone ten to twelve years old.  However, the Constitution does not prohibit lengthy incarceration of juveniles.  In *Miller v. Alabama*, the Court restricted—but did not eliminate—the ability to sentence juveniles to life in prison, stating:

> Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

567 U.S. 460, 480 (2012).  While intellectually disabled individuals have some of the characteristics of youth that reduce their culpability for crimes, they do not have all of the characteristics that the Court relied upon when requiring trial courts to consider the age and background of children before imposing a life sentence without parole.  *Id.* at 476.  While the intellectually disabled and adolescents are both characterized by immaturity, irresponsibility, and recklessness, and both are susceptible to peer pressure and influence, these characteristics are *transient* in youth, but somewhat fixed in the intellectually disabled individual who is fully grown.  Youth suggests the possibility of rehabilitation and maturity; intellectual disability does not hold as great a possibility.  If life without parole can be imposed on a person under the age of eighteen, then the Eighth Amendment does not restrict the length of sentence imposed on an intellectually disabled person.

White's counsel was not deficient in the sentencing hearing before the trial judge on January 15, 2014.  Counsel is not required to file a futile motion, and challenging White's sentence on Eighth Amendment grounds would be futile.  *Moody*, 408 F.3d at 151.  Counsel presented the compelling testimony of Dr. James and asked the court to impose a sentence below the guidelines.  The court chose to impose the jury recommended sentence—which was within the guideline range.  The sentence recommended by the jury was only ten years above the mandatory minimum sentences that could have been imposed.  It is not a life sentence, but a

term of years.  White is eligible for good time credit while in the penitentiary, which could reduce his sentence by as much as ten years.  Further, White will be eligible for parole at age sixty.  Va. Code Ann. § 53.1-40.01.  Finally, a sentence of seventy-six years for three homicides, armed statutory burglary, attempted robbery, and several firearms convictions is not disproportionate or cruel and unusual.  Both the trial court and the jury clearly considered White's background in setting his sentence.  Without his childhood victimization and his intellectual disability, other defendants have been executed or received life sentences for lesser crimes.

Because White has not established deficient performance or prejudice, this claim is not substantial, and he has not overcome his procedural default of this issue.  I will, therefore, dismiss this claim.

## V. CERTIFICATE OF APPEALABILITY

When issuing a final order adverse to a § 2254 petitioner, the court must issue or deny a certificate of appealability.  *See* Fed. R. Governing § 2254 Cases 11(a).  A certificate of appealability may issue only if the movant has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The movant must show that reasonable jurists could debate whether the petition should have been resolved in a different manner based on the law or that the issues presented were sufficiently weighty to deserve encouragement to proceed further.  *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483–84

(2000). In the context of a procedural ruling, the movant must demonstrate both that the dispositive procedural ruling is debatable and that the action states a debatable claim of the denial of a constitutional right. *Gonzalez v. Thaler*, 565 U.S. 134, 140–41 (2012).

I decline to issue a certificate of appealability because White has not made a substantial showing of the denial of a constitutional right and reasonable jurists would not find the court's procedural ruling to be debatable or wrong.

For the reasons stated, I will grant the Motion to Dismiss.

A separate Final Order will be entered herewith.

DATED: August 16, 2021

/s/ JAMES P. JONES
United States District Judge